**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 2, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

CHARLES BROWDER, in his
individual capacity and as personal
representative of the Estate of Ashley
Browder; LINDSAY BROWDER;
DONNA BROWDER,

      Plaintiffs - Appellees,

v.

CITY OF ALBUQUERQUE; ADAM
CASAUS, in his individual capacity,

      Defendants - Appellants,

and

ALBUQUERQUE POLICE
DEPARTMENT; RAYMOND
SCHULTZ, in his capacity as APD
Police Chief,

      Defendants.

No. 14-2048

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:13-CV-00599-RB-KBM)**

---

Deborah D. Wells of Kennedy, Moulton, & Wells, P.C., Albuquerque, New
Mexico (Stephanie M. Griffin, Assistant City Attorney, City of Albuquerque
Legal Department, Albuquerque, New Mexico, with her on the briefs), for
Appellants.

Sean P. McAfee of the Law Office of Brian K. Branch, Albuquerque, New
Mexico (Brian K. Branch of the Law Office of Brian K. Branch, Albuquerque,
New Mexico, and Erik R. Thunberg, Albuquerque, New Mexico, with him on the
brief), for Appellees.

---

Before **TYMKOVICH, GORSUCH,** and **HOLMES**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

Adam Casaus was going nowhere fast.  After finishing his shift at the
Albuquerque police department and on no one's business but his own, he got into
his police cruiser, flipped on the emergency lights, and drove off at an average of
about 66 miles an hour on city surface streets through ten different intersections
over a stretch of 8.8 miles.  Then he reached an eleventh intersection.  The light
was red.  He pressed the gas pedal, ignored the light, and the result was a terrible
crash.  Ashley Browder died.  Her sister, Lindsay, suffered grave injuries.
Sergeant Casaus eventually found himself criminally charged with reckless
vehicular homicide in state court.  Now Lindsay and her parents have brought this
civil suit seeking damages under 42 U.S.C. § 1983.  Sergeant Casaus asked the
district court to dismiss the Browders' complaint on grounds of qualified
immunity.  The district court declined that relief and so do we.

The Browders' suit follows this course.  Section 1983 permits citizens to
sue for any assault on their constitutional rights that occurs "under color of" state
law.  The Supreme Court has read this language broadly, as encompassing even

some situations in which state law enforcement officers actually violate state law. *Monroe v. Pape*, 365 U.S. 167, 184 (1961) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).  *But see Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) (citing *Monroe*, 365 U.S. at 224-25 (Frankfurter, J., dissenting)).  Both sides before us accept that this case involves one of those situations and so we proceed on the same assumption, accepting (without deciding) that Sergeant Casaus's conduct came "under color of" state law.  Of course, though, that's just the beginning of things for § 1983 is but a means to an end, a vehicle for bringing claims, and it remains incumbent on the plaintiff to identify some violation of a constitutional (or other federal) right.

In this case, the Browders point to the Fourteenth Amendment.  More particularly, they point to the Amendment's due process clause which prohibits the government from depriving individuals of their lives, liberty, or property without due process of law.  The Supreme Court has interpreted this language as guaranteeing not only certain procedures when a deprivation of an enumerated right takes place (procedural due process), but also as guaranteeing certain deprivations won't take place without a sufficient justification (substantive due process).  Some suggest this latter doctrine with the paradoxical name might find a more natural home in the Privileges and Immunities Clause; others question whether it should find a home anywhere in the Constitution.  But, the Supreme Court clearly tells us, home it has and has where it is.  At the same time, the

Court has warned that the doctrine should be applied and expanded sparingly "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)) (internal quotation mark omitted).

Under what guideposts the Court has so far staked out, our first job in assessing a substantive due process claim is to make a "careful description" of the allegedly violated right. *Id.* at 721 (internal quotation marks omitted). Then we must ask whether that right counts as a "fundamental" one, a limited class of rights sometimes described by the Court as those that can fairly claim to be "objectively, deeply rooted in this Nation's history and tradition." *Id.* at 720-21 (internal quotation marks omitted); *see also Palko v. Connecticut*, 302 U.S. 319, 325 (1937) (describing fundamental rights as those "implicit in the concept of ordered liberty"). Next we must ask whether the government's alleged infringement of the right in question was "direct[]" and "substantial[]." *Zablocki v. Redhail*, 434 U.S. 374, 387 (1978).

If the plaintiff's injury meets these tests we then assess whether the government can muster sufficient justification for its actions. If the government infringed the plaintiff's right through legislative activity, the Supreme Court has told us to inquire whether the legislation is "narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721 (quoting *Reno v. Flores*,

507 U.S. 292, 302 (1993)) (internal quotation mark omitted).  If the infringement

is the result of executive action, the Supreme Court has instructed us to ask

whether that action bears a "reasonable justification in the service of a legitimate

governmental objective" or if instead it might be "characterized as arbitrary, or

conscience shocking."  *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 847

(1998) (quoting *Collins*, 503 U.S. at 128).  Even if the plaintiff can satisfy these

standards, when a state tort suit can provide the same relief as a federal § 1983

claim and there's no reason to suppose a state court won't fairly hear the claim it

is an open question whether federal courts — though empowered to hear the suit

— should abstain in favor of the state remedial processes.  *See Parratt v. Taylor*,

451 U.S. 527, 541 (1981); *Lewis*, 523 U.S. at 840 n.4 (citing *Albright v. Oliver*,

510 U.S. 266, 281-86 (1994) (Kennedy, J., concurring in the judgment)); *see also*

Concurrence, *post*.[1]

---

[1] *Lewis* indicated that its standard for executive conduct is intended to be
even more demanding than the *Glucksberg* standard for legislative action.  *Lewis*,
523 U.S. at 847 n.8.  You might ask why — why has the Court devised different
tests for measuring the propriety of infringements on fundamental rights
depending on the offending governmental agent?  Perhaps the answer lies in the
fact that legislation touching on fundamental rights is clearly state action and
clearly affects the liberty of an entire class of persons while executive action
infringing fundamental rights can often come by way of isolated and unauthorized
conduct by individual rogue executive agents against individual citizens.  Both
forms of conduct may be actionable under *Monroe*, but perhaps the Court wishes
to suggest that the latter is a more attenuated form of state action that may
warrant greater scrutiny before it is held to rise to a level of constitutional
concern.  Admittedly, some question lingers about all this.  In *Chavez v.
Martinez*, a three-justice plurality seemed to employ *both* the "legislative" and
(continued...)

In cases involving executive action like the one before us still another question arises:  how are we supposed to go about trying to distinguish executive actions that *Lewis* describes as "reasonably justified in the service of legitimate governmental objectives" from those it describes as "arbitrary or conscience shocking"?  This area remains very much unchartered and the conscience-shocking test does seem (in *Glucksberg*'s words) more than a little "open-ended," but the Court has offered us two further thoughts by way of direction.

First, it's told us to consult history and precedent.  *See Lewis*, 523 U.S. at 847 n.8; *id.* at 857 (Kennedy, J., concurring); *id.* at 860-62 (Scalia, J., concurring in the judgment).  The constitutional due process guarantee traces its roots to the Magna Carta and the effort to deny capricious kings the "power of destroying at pleasure," what Blackstone called the "highest degree" of tyranny.  1 William Blackstone, *Commentaries* *133.  So perhaps it comes as little surprise that we should look to the history of efforts to tame arbitrary governmental action to determine whether and under what conditions the conduct at issue is accepted as a

---

[1](...continued)
"executive" tests in a case challenging executive action.  538 U.S. 760, 774-76 (2003).  What exactly this means is unclear.  Perhaps the Court meant to allow plaintiffs to choose a test.  *See Seegmiller v. LaVerkin City*, 528 F.3d 762, 767-68 (10th Cir. 2008) (suggesting as much but only in dicta).  Perhaps the Court meant only to suggest that the plaintiff before it was destined to lose under any possible test.  Perhaps it is impossible to know what such a splintered Court meant.  All we can say with certainty is that *Chavez* did not expressly overrule *Lewis*'s holding that the "arbitrary or conscience shocking" test is the appropriate one for executive action so we feel obliged to apply it.

necessary incident of organized society — or whether it is associated with the sort of whimsical sovereign the due process guarantee was designed to guard against.

Second, the Court has suggested that careful attention to mens rea can help. *Lewis*, 523 U.S. at 849-50.  Negligence toward a fundamental right, we are told, will never suffice to suggest the sort of caprice that rises to the level of constitutional concern.  Meanwhile, in cases where forethought is feasible some form of recklessness to the plaintiff's fundamental right may be enough:  our tradition suggests that we can and should usually expect more from the sovereign than deliberate indifference to fundamental rights like life, liberty, and property.  Still, in cases where the legitimate governmental objective is so pressing that the luxury of forethought doesn't exist (e.g., responding to an emergency or dealing with a prison riot), the Court has held that to establish inappropriate caprice even more is required.  In these cases even an intent to undertake the act that impairs the plaintiff's fundamental right isn't enough:  a further intent to impair the plaintiff's fundamental right — what's sometimes called "specific" intent — is necessary.  The Court has adopted this high standard in recognition of the fact that in emergency situations officers face "obligations that tend to tug against each other" — the duty to come to the aid of citizens in distress and the duty to protect the rights of those who may innocently stand in the way — and little time in which to deliberate their resolution.  *Id.* at 853-54.

Attempting to follow as best we can what guidance we've received in this murky area, we believe we can say this much about the case at hand.  No one before us disputes that Ashley's death and the damage done to Lindsay's person count as direct and substantial impairments of their fundamental right to life, so we can and do take that much as given.  And while the line that separates executive actions that are "reasonably justified" in the service of a "legitimate governmental objective" and those that are "arbitrary or conscience shocking" appears anything but clearly defined, this case does not seem to us to implicate any serious borderline disputes.  "Arbitrary" actions are those performed capriciously or at one's pleasure and without good reason.  *See* 1 The Oxford English Dictionary 602 (2d ed. 1989); *see also* Black's Law Dictionary 119 (9th ed. 2009).  And on the complaint's telling at least, Sergeant Casaus's actions appear the very model of that.  He used his official squad car and activated its emergency lights and proceeded to speed through surface city streets at more than 60 miles per hour over 8.8 miles through eleven city intersections and at least one red light — all for his personal pleasure, on no governmental business of any kind.

History and precedent support our conclusion.  In a society governed by laws and not men officers acting as private persons on private time have traditionally enjoyed no special immunities for their conduct.  *See* 1 Blackstone, *supra*, at ch. 9 (setting forth the common law rights of sheriffs and constables and

nowhere suggesting any general immunity for their private misconduct); *see also* Restatement (First) of Torts § 121 cmts. a, c, and e (1934) (officer's privilege to arrest and thus his conditional exemption from otherwise applicable tort law limited by any jurisdictional and type-of-offense conditions inherent in his appointment). And the sort of conduct alleged here amounts to conduct historically punished as a felony by private persons. *See, e.g.*, N.M. Stat. Ann. § 66-8-101. What's more, the New Mexico statute empowering police officers to speed and run red lights when pursuing a lawbreaker expressly states that it does not insulate an officer "from the consequences of his reckless disregard for the safety of others." N.M. Stat. Ann. § 66-7-6(D). And state laws commonly deem it an abuse for officers to employ their emergency lights or sirens for their own business. *See, e.g.*, N.M. Stat. Ann. § 66-3-843; N.Y. Veh. & Traf. Law § 375(41)(2); 75 Pa. Cons. Stat. Ann. § 4571(e).

*Lewis*'s mens rea test confirms our conclusion too. Speeding and jumping red lights often may signify no more than negligence — the failure to do what a reasonably prudent person would do. Even in this case we acknowledge a jury might find Sergeant Casaus guilty of no more than that. But on the facts pleaded a reasonable jury could infer something more, a conscious contempt of the lives of others and thus a form of reckless indifference to a fundamental right — precisely the sort of mens rea *Lewis* says will normally suffice to establish liability. Neither do we think it appropriate to demand specific intent in these

circumstances. *Lewis* held specific intent may be required to suggest arbitrary or conscience-shocking behavior in cases where the officer has been asked to respond to emergencies of citizens in need. But the case never suggested that such a demanding form of mens rea is necessary or appropriate to suggest arbitrary or conscience-shocking conduct in cases where the officer isn't pursuing any emergency or any official business at all. And for good reason. The officer in these circumstances faces no tug between duties owed to two sets of innocents, there is no emergency, no one has called for his aid, and he sits instead in the same place as everyone else when it comes to respecting the rights of others.

In response to this analysis Sergeant Casaus offers three main rejoinders and forgoes another. The one he forgoes is perhaps the most significant. According to the complaint, Sergeant Casaus's conduct wasn't authorized by any state rule, policy, or custom and — as we've noted — it's an open question in cases like this whether *Parratt* requires the plaintiff to show that state law supplies no adequate remedial course before proceeding in federal court. *See supra* at 5; Concurrence at 4. But instead of pursuing a line of defense that would require him to accept that he acted without any legal authorization, Sergeant Casaus has chosen instead to pursue a defense in precisely the opposite direction (as we will see in a moment). In light of this tactical decision, we deem any *Parratt* argument forfeited and reserve for another day the question whether it applies to substantive due process claims — the very course the Supreme Court

itself charted when the defendant in *Lewis* similarly failed to raise a *Parratt*

argument.  523 U.S. at 840 n.4.

When it comes to the defense Sergeant Casaus does attempt — claiming

that he was acting on official business — we encounter a different problem.  The

officer insists that at the time of the accident he was pursuing another car

operating in a dangerous manner.  If true, of course, this could constitute a

"reasonable justification for conduct in service of a legitimate governmental

objective," for *Lewis* suggests specific intent to infringe the rights of others may

be required to push a case like that into the realm of the arbitrary or conscience-

shocking — and no one before us claims Sergeant Casaus bore such a mens rea.

*See, e.g., Green v. Post*, 574 F.3d 1294, 1301-10 (10th Cir. 2009).  But the

problem with this defense in this case is that requires us to disregard the

complaint's well-pleaded facts.  The complaint expressly contends that Sergeant

Casaus was pursuing no official business of any kind.  And it backs this

contention with facts, alleging that the officer didn't call or radio dispatch to

relate any infraction by any other driver, though police policy required him to do

so.  And alleging that an eyewitness to events says Sergeant Casaus wasn't

following anyone at the time of the crash.  Perhaps the officer might convince a

jury otherwise at trial.  But it's our duty at this stage to take the well-pleaded

facts as true and draw every inference in the Browders' favor.  And viewing the

complaint in that light, we don't doubt the Browders have stated a plausible claim for relief.

Attempting a different tack, Sergeant Casaus says the undisputed fact that he activated his emergency lights (but not his siren) establishes as a matter of law he wasn't acting recklessly. But we cannot agree with this argument either. We don't doubt that an officer using his lights and sirens on official business usually does so at least in part to ensure the safety of others, or that this conduct may go a long way in many cases toward disproving any specific intent to harm bystanders. But neither is it the case that officers who go drag racing down Main Street on their own time only have to flip on their lights or sirens to immunize themselves from any responsibility for the accidents they cause. Certainly Sergeant Casaus cites no authority for such a remarkable claim and, as we've seen, a good deal of precedent and history suggests the opposite view. *See supra* at 8-9. Indeed and again, we do not doubt that, when an officer uses his emergency lights on his business and not the public's and goes racing through traffic lights, a reasonable jury could conclude that his conduct amounts to an abuse of power; a demand that others get out of his way so he might pursue his personal business before they might pursue theirs; and, when added to the other facts present in this case, a reckless indifference to the lives of others.

Finally, Sergeant Casaus says he didn't have time enough to form a reckless indifference to human life. He didn't, he says, because it took him only

- 12 -

2.5 seconds to travel through the intersection before impact.  But even assuming (without granting) the requisite mens rea couldn't be formed in that short period, Sergeant Casuas here again impermissibly asks us to view the facts in the light most favorable to him rather than the Browders.  On the facts alleged, after all, one could just as easily conclude that the officer had more like eight minutes than 2.5 seconds to reflect on his actions — from the time he started driving at high speed on city surface streets through eleven intersections over 8.8 miles until the time of the crash.

Having determined that, taking the facts alleged as true, Sergeant Casaus violated the constitutional rights of Ashley and Lindsay Browder one more question still remains:  were those rights clearly established at the time at issue in this case such that "every reasonable official would have understood that what he [was] doing" violated them?  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (internal quotation mark omitted).  Unless we can say so much, Sergeant Casaus rightly reminds us, he remains entitled to qualified immunity, whatever he may have done.

In deciding the "clearly established law" question this court employs a "sliding scale" under which "the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."  *Shroff v. Spellman*, 604 F.3d 1179, 1189-90 (10th Cir. 2010) (alteration omitted) (quoting *Fogarty v. Gallegos*, 523 F.3d

1147, 1161 (10th Cir. 2008)) (internal quotation marks omitted).  After all, some
things are so obviously unlawful that they don't require detailed explanation and
sometimes the most obviously unlawful things happen so rarely that a case on
point is itself an unusual thing.  Indeed, it would be remarkable if the most
obviously unconstitutional conduct should be the most immune from liability only
because it is so flagrantly unlawful that few dare its attempt.  *See Northen v. City
of Chicago*, 126 F.3d 1024, 1028 (7th Cir. 1997) ("[T]he police cannot obtain
immunity for liability for false arrests by arresting people on preposterous
charges and then pointing to the absence of any judicial decision that declares the
statutory interpretation underlying the charges to be preposterous.").

　　　Ours is perhaps a case along these lines.  We've encountered plenty of
cases involving officers responding to emergency calls who unintentionally cause
traffic accidents.  But we haven't encountered many cases involving deadly traffic
accidents with officers speeding on their own business — presumably (hopefully)
because such things happen rarely.  Even so, the Supreme Court and this court
have both spoken unmistakably to this situation.  In *Lewis*, the officer was using
his police car to respond to an emergency and the Court held he didn't violate the
Constitution.  But the Court also expressly noted when a private person suffers a
serious physical injury "'due to a police officer's *intentional misuse* of his
vehicle'" a viable due process claim can arise.  523 U.S. at 854 n.13 (quoting
*Checki v. Webb*, 785 F.2d 534, 538 (5th Cir. 1986)).  As early as 1996, this court

warned that an officer who kills a person while speeding at 60 miles an hour on surface streets absent any emergency and in violation of state law invites a Fourteenth Amendment claim. *Williams v. City and County of Denver*, 99 F.3d 1009 (10th Cir. 1996), *vacated*, 140 F.3d 855 (10th Cir. 1997). Though this court eventually vacated the *Williams* panel decision and remanded the case for reconsideration in light of *Lewis*, the result proved the same in the end precisely because *Lewis* itself made the same point the *Williams* panel had. *See Williams v. City and County of Denver*, Civ. Act. No. 90 N 1176, at 16 (D. Colo. Sept. 28, 1999). Indeed, in *Green* this court noted *Williams*'s warning with approval. 574 F.3d at 1298 n.5. And it proceeded to hold that, as of 2006, it was clearly established "a police officer *could* be liable under the Fourteenth Amendment" for driving in a manner that exhibits "a conscience-shocking deliberate indifference" to the lives of those around him. *Id.* at 1306. Taken collectively, we believe all this was more than enough to make clear to any reasonable officer in 2013 (the time of the accident) that the conduct alleged here could give rise to a claim under the Fourteenth Amendment.[2]

---

[2] Although the City of Albuquerque joins Sergeant Casaus's appeal, it argues only that he didn't violate the Constitution for the reasons we've already considered and rejected. We don't doubt the City could have raised additional lines of defense — *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) — but for whatever reason it chose not to do so and once again we decline to pass on potential arguments not presented.

- 15 -

The district court's decision is affirmed and the case is remanded for

further proceedings consistent with this opinion.

14-2048, *Browder v. City of Albuquerque*

**GORSUCH**, Circuit Judge, concurring.

     We shouldn't be surprised that the common law usually supplies a sound remedy when life, liberty, and property are taken.  After all, the whole point of the common law as it evolved through the centuries was to vindicate fundamental rights like these.  That's the insight of *Parratt v. Taylor*, 451 U.S. 527 (1981).  While 42 U.S.C. § 1983 authorizes federal courts to remedy constitutional violations by state officials acting under color of state law, and while *Monroe v. Pape*, 365 U.S. 167 (1961), has read this authorization broadly, the authority to remedy a claim doesn't always mean the duty to do so.  Federal courts often abstain when they otherwise might proceed out of respect for comity and federalism and the absence of any compelling need for their services.  *See, e.g.*, *Younger v. Harris*, 401 U.S. 37, 44 (1971).  *Parratt* explains that this familiar principle applies in the § 1983 context just as it does elsewhere.  Often, after all, there's no need to turn federal courts into common law courts and imagine a whole new tort jurisprudence under the rubric of § 1983 and the Constitution in order to vindicate fundamental rights when we have state courts ready and willing to vindicate those same rights using a deep and rich common law that's been battle tested through the centuries.  *See* 451 U.S. at 539-44; *see also Mann v. City of Tucson, Dep't of Police*, 782 F.2d 790, 797-98 (9th Cir. 1986) (Sneed, J., concurring in the result); Richard H. Fallon, Jr., *Some Confusions About Due*

*Process, Judicial Review, and Constitutional Remedies*, 93 Colum. L. Rev. 309, 310-11 (1993).

Of course, if a plaintiff can establish that state law won't remedy a constitutional injury *Parratt* recognizes that the doors of the federal courthouse should remain open to him. So, for example, if a state has overridden the common law and erected a statutory immunity where the Constitution would recognize none, a federal court shouldn't abstain. Or if the state proceeds more invidiously, maintaining facially adequate law on the books but acting discriminatorily in practice, the federal court must hear the case. Federal courts might even assume state remedial processes won't suffice to redress the constitutional injury when a state rule, policy, or custom itself caused the injury — for there one might worry about a sort of potential conflict of interest or at least the appearance of one. But when a rogue state official acting in defiance of state law causes a constitutional injury there's every reason to suppose an established state tort law remedy would do as much as a novel federal remedy might and no reason exists to duplicate the effort. *See, e.g.*, *Parratt*, 451 U.S. at 543-44; *Mann*, 782 F.2d at 798 (Sneed, J., concurring in the result).

Our case highlights the point. We face a traffic accident, a deeply tragic traffic accident, but also exactly the sort of thing state courts have long and ably redressed. A state court could provide relief using established tort principles (e.g., negligence) and there's little reason to doubt it would — after all, the

- 2 -

officer's actions violated state law and he's even been criminally charged.  Or a federal court might provide the same relief using primordial constitutional tort principles that must be expounded more or less on the fly — by asking what's "arbitrary" or what "shocks the judicial conscience."  *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  The Supreme Court has acknowledged that constitutional liability principles like these are "open-ended" and provide few "guideposts for responsible decisionmaking."  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).  So why take up the challenge needlessly?  When doing so risks imposing a cloud of uncertainty on government officials about the scope of their duties and liabilities?  When it threatens to invite disuniformity among the circuits as they attempt to reproduce hundreds of years of accretive common law decisionmaking?  *See* Fallon, *supra*, at 349-50.  To entertain cases like this in federal court as a matter of routine risks inviting precisely the sort of regime the Supreme Court has long warned against — one in which "any party who is involved in nothing more than an automobile accident with a state official could allege a constitutional violation" in federal court and thus "make of the Fourteenth Amendment a font of tort law" needlessly superimposed on perfectly adequate existing state tort law systems.  *Albright v. Oliver*, 510 U.S. 266, 284 (1994) (Kennedy, J., concurring in the judgment) (quoting *Parratt*, 451 U.S. at 544); *see also Lewis*, 523 U.S. at 848; *Paul v. Davis*, 424 U.S. 693, 701 (1976).

True, language in *Zinermon v. Burch*, 494 U.S. 113 (1990), suggests that *Parratt*'s abstention principle may apply to procedural and not substantive due process claims like the one in this case. *Id.* at 124-25. But, respectfully, the suggestion along these lines came in dicta and several reasons exist to doubt it. For starters, the distinction between procedural and substantive due process isn't found in the constitutional text and is famously malleable in any event; one might wonder whether a boundary like that offers a stable foundation on which to rest such a weighty distinction. *See, e.g.*, *Albright*, 510 U.S. at 285 (Kennedy, J., concurring in the judgment); *Mann*, 782 F.2d at 796-98 (Sneed, J., concurring in the result). One might ask too whether *Parratt* itself might be better understood as a substantive rather than a procedural due process case. *See, e.g.*, Fallon, *supra*, at 341-44. Then there's the fact the Supreme Court and others have already applied *Parratt* to cases involving the deprivation of substantive rights. *See, e.g.*, *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 195 (1985); *Newsome v. McCabe*, 256 F.3d 747, 750-51 (7th Cir. 2001); *Schaper v. City of Huntsville*, 813 F.2d 709, 718 (5th Cir. 1987). And the fact the Supreme Court has repeatedly admonished courts to proceed with special caution when handling substantive due process claims. *See, e.g.*, *Glucksberg*, 521 U.S. at 720. Finally, after *Zinermon* came *Lewis*, a decision in which the Court specifically reserved the question whether *Parratt* applies to substantive due process claims, confirming that the issue remains a live and open one. 523 U.S.

- 4 -

at 840 n.4.  Indeed, it's hard to identify a principled justification for extending *Parratt* piecemeal to procedural due process claims rather than wholesale to all due process claims.  *Zinermon* observed that a substantive due process violation is complete upon a deprivation while a procedural due process violation requires us to wait and see what process the state provides.  But it's unclear why that distinction makes a difference when *Parratt*'s logic cuts across both kinds of cases, asking in all events whether there's a need for federal intervention or whether state remedial processes might do just as well.

Losing a child is a nightmare of the darkest sort and the suffering the Browder family has had to endure is beyond words.  But there's little reason to think that state courts would fail to fulfill their oaths to see justice done in this case, at least as well as it can ever be done in a case so tragic.  To be sure, a *Parratt* argument wasn't properly presented in this case and so we rightly hold it waived in this instance.  But when the issue is raised in appropriate future cases, I believe we would do well to consider closely its invitation to restore the balance between state and federal courts.  For we should be able to expect both that justice will be done in cases like this one and that it will be done while exhibiting the sort of cooperative federalism that has traditionally defined our law.