IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CHARLES BROWDER, in his individual
capacity and as Personal Representative
of The Estate of ASHLEY BROWDER,
LINDSAY BROWDER, and DONNA
BROWDER,

        Plaintiffs,

v.                                                                                           No. CIV 13-0599 RB/KBM

CITY OF ALBUQUERQUE, and ADAM
CASAUS in his individual capacity,

        Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiffs' Second Motion for Relief and Sanctions Based on Intentional Spoliation of Evidence by Defendant City of Albuquerque, filed on March 18, 2016 (Doc. 179), as well as the parties' supplemental briefs (Docs. 270, 272). Jurisdiction arises under 28 U.S.C. § 1331. Having considered the submissions of counsel and relevant law, the Court will **GRANT IN PART** Plaintiffs' motion.

**I.    Procedural History and Statement of Facts[1]**

This case arises from a tragic traffic accident that occurred when Defendant Casaus's police vehicle collided with Plaintiff Lindsay Browder's vehicle. At issue in this motion for relief and sanctions is video footage from two city intersections. Despite the fact that several officials from the Albuquerque Police Department (APD) and Bernalillo County Sheriff's Office (BCSO)

---

[1] The Court laid out the procedural history and statement of facts in its previous Memorandum Opinion and Order on this matter and has supplemented this opinion with additional facts from the parties' supplemental briefs where relevant. (*See* Docs. 242, 270, 272.)

apparently saw the footage and APD Chief Schultz directed that the footage be preserved, the footage was lost before Plaintiffs were allowed access to it.

### A.     The Incident

Defendant Adam Casaus, a sergeant with the APD, was involved in a traffic accident with Plaintiffs Lindsay and Ashley Browder at approximately 1:31 or 1:32 a.m. on Sunday, February 10, 2013. (Doc. 8 at ¶ 26; Doc. 146, Ex. 1 at 150:13–151:20, Ex. 3 at 72:3–5.) Defendant Casaus, driving westbound on Paseo Del Norte, allegedly saw a vehicle ahead of him driving erratically, and he sped up to pull the driver over. (Doc. 163, Ex. A at 72:22–74:16, 78:9–81:5; Doc. 181 at 7.) Plaintiffs dispute Defendant Casaus's assertion that he was ever following a vehicle. (*See* Doc. 205 at 5–7.) Defendant Casaus testified that he could not identify the make and model of the vehicle or its license plate number, but he could see tall, skinny taillights. (Doc. 163, Ex. A at 75:12–76:7; Doc. 181 at 7.) He believes he saw the vehicle he was following go through the intersection at Eagle Ranch and Paseo Del Norte, the same intersection where the parties collided. (Doc. 146, Ex. 1 at 95:13–97:12.)

As he approached that intersection, he also saw a vehicle stopped in the right-hand lane of westbound Paseo Del Norte waiting on a red light. (*Id.* at 97:16–20; Doc. 163, Ex. 1 at 85:6–11.) The stopped vehicle belonged to Ms. Jana Villanueva, an eyewitness to the accident who had merged onto westbound Paseo Del Norte from the Coors ramp driving a black 2008 Cadillac with tall taillights. (Doc. 146, Ex. 2 at 7, Ex. 3 at 46:2–5.) Defendant Casaus collided with the Browder vehicle in the intersection of Eagle Ranch Road and Paseo Del Norte. (Doc. 146, Ex. 1 at 150:13–151:20.) There is a factual dispute in this case regarding what color the traffic light was when Defendant Casaus entered the intersection. (*See* Doc. 205 at 4–7.)

B.     The Video Footage

Investigating Deputy Leonard Armijo of the Bernalillo County Sheriff's Office, who took the lead in the initial investigation into the accident, confirmed Ms. Villanueva's story. (Doc. 146, Ex. 2 at 3, 7.) Deputy Armijo viewed video footage recorded from a traffic camera located at the intersection of Coors Boulevard and La Orilla Road NW and saw what appeared to be Ms. Villanueva's vehicle at that location approximately two minutes prior to the accident. (*Id.* at 7; *see also* Doc. 270, Ex. F at ¶¶ 3–4.) He concluded that Ms. Villanueva's Cadillac could not have been the vehicle Defendant Casaus was allegedly following. (Doc. 146, Ex. 2 at 7; *see also* Doc. 146, Ex. 3 at 92:4–11.)

The video footage Deputy Armijo saw came from the Real Time Crime Center (RTCC). (Doc. 146, Ex. 2 at 7.) The RTCC is a division of the City of Albuquerque and the APD. (*See* Doc. 200 at 3 ¶ 4, Ex. A at 87:10, Ex. C at 5:15–23.) The RTCC established a citywide video network using city traffic cameras and surveillance systems from local businesses. (Doc. 200, Ex. D at 12:3–13.) The RTCC was not fully operational in February, 2013; in fact, the City did not completely finish building the center until March, 2013. (Doc. 200, Ex. C at 6:1–3, 31:8–15.) On the day of February 10, 2013, however, at least three traffic cameras captured footage Plaintiffs assert is relevant to this lawsuit. (*See* Doc. 179 at 3–4.) These cameras are located at the intersections of Paseo Del Norte and Eagle Ranch Road (where the accident occurred), Coors and La Orilla NW (where Deputy Armijo saw Ms. Villanueva's Cadillac on video recorded minutes before the accident), and Paseo Del Norte and Golf Course Road. (*See* Doc. 179 at 4–5, Exs. 1–3.)

Plaintiffs received video footage from all three intersections, but the parties discovered at some point much later in this litigation that the footage from the Paseo Del Norte and Eagle Ranch Road and Coors and La Orilla NW intersections is from Saturday, February 9, rather than from the

date of the accident, Sunday, February 10. (*See* Doc. 179 at 4–5, Exs. 1–3.) In the 24 hours after the accident, however, several officials from the APD, BCSO, and the RTCC were able to watch video footage from the correct date and time, as detailed infra. Any video from the correct date has since been lost. (*See* Doc. 270, Ex. E at ¶¶ 11–13, Ex. G at ¶¶ 1, 8.)

RTCC Director Mr. T.J. Wilham looked at footage from the relevant intersections with APD Chief Schultz on Sunday morning, well within 24 hours of the accident.[2] (Doc. 179, Ex. 5 at 34:5–25, 43:1–24.) Mr. Wilham recalls seeing (1) Plaintiff Lindsay Browder's vehicle on footage from one of the cameras; and (2) squad cards pull up on Eagle Ranch to block traffic on footage from Eagle Ranch and Paseo Del Norte, in spite of the fact that the camera was not facing the intersection. (*Id.* at 23:8–24:12, 43:6–18.) Chief Schultz directed Mr. Wilham to give the footage to the necessary officials. (*Id.* at 43:19–24.)

Deputy Paul Gonzales, who acted as the secondary investigator from the BCSO, also saw footage at the RTCC. (Doc. 200, Ex. A at 49:10–22, 52:1–3, 87:9–12.) Deputy Gonzales was called to the scene of the accident around 2:30 a.m. on February 10. (*Id.* at 49:19–22.) His primary responsibilities involved photographing and diagramming the accident scene. (*Id.* at 52:4–25, 61:14–22.) After he finished at the scene, he went to the RTCC to see if he could find any video footage from traffic cameras at or near the relevant intersection. (*Id.* at 87:9–12.) He found footage from four intersections: Coors Boulevard and Alameda (south of Paseo Del Norte and Coors), Coors Boulevard and Eagle Ranch Road (south of Paseo Del Norte and Coors), Paseo Del Norte and Eagle Ranch Road, and Paseo Del Norte and Golf Course Road. (*Id.* at 87:18–25.)

---

[2] Mr. Wilham recalls that he viewed the footage with Chief Schultz before anyone from BCSO contacted him. (*See* Doc. 179, Ex. 5 at 25:10–17.) It appears that Deputy Gonzales obtained the video and CDs from Sergeant Felipe Garcia, but the record is murky on when the various officials visited the RTCC and when the video footage was burned onto CDs. (Doc. 200, Ex. D at 19:9–12, 20:6–14.)

Deputy Gonzales testified he was unable to see footage of the accident itself, because the camera at Paseo Del Norte and Eagle Ranch Road was pointed toward a gas station in the northwest corner of the intersection instead of toward the street. (*Id.* at 88:7–16.) He believes he saw Plaintiff Lindsay Browder's vehicle turn from Coors onto Eagle Ranch Road. (*Id.* at 88:23–24.) He does not remember seeing any vehicles that might match the one Defendant Casaus was allegedly following. (*Id.* at 89:10–15.) He got video of the four intersections from approximately ten minutes prior to the accident through ten minutes after, covering the approximate period from 1:20–1:40 a.m., burned the video footage onto CDs, and took the CDs to Deputy Armijo. (*Id.* at 89:1–4.)

Sergeant Felipe Garcia, the RTCC employee charged with establishing the video network and the person who was the most qualified at the time to respond to requests and produce video, also came into the RTCC on Sunday morning to help pull video footage. (Doc. 179, Ex. 5 at 33:11–14; Doc. 200 at 3 ¶ 6, Ex. D at 11:12–18, 12:3–13:6.) Mr. Wilham asserts this was the first time Sergeant Garcia had ever been instructed to pull video from the servers, so they were all learning as they went. (Doc. 200, Ex. C at 30:1–4.) Sergeant Garcia testified that he was directed to pull video from three different traffic cameras for a specific time period. (Doc. 200, Ex. D at 13:2–25.) He knew the video was related to a fatal traffic accident involving an APD officer. (*Id.* at 19:9–25.)

Each video pulled from the RTCC servers has a time and date stamp. (*Id.* at 14:5–11.) When he pulled the videos from the server where these three traffic cameras were stored, Sergeant Garcia discovered that the time shown on the server was off by one hour. (*Id.* at 14:12–24.) Consequently, instead of pulling video footage from February 10 around 1:30 a.m., Sergeant Garcia realized he would need to pull video from around 12:30 a.m. (or 00:30). (*See id.* at 14:22–15:19; *see also* Doc. 179, Exs. 1–3.) Sergeant Garcia testified that in order to obtain video footage

5

from an intersection camera, he found the intersection he needed in the system, clicked on the desired date from a pop-up calendar (February 10, 2013), and used a scroll bar to select the desired time (00:30). (*Id.* at 20:22–23:24.) Because someone had directed him to pull video from three intersections, he repeated this process three separate times on three separate computers. (*Id.* at 23:10–24:17.) But instead of inputting the correct date and time of February 10, 2013 and 00:30 three separate times, Sergeant Garcia input February 9, 2013 for two of the three intersections (the two located at Eagle Ranch Road and Paseo Del Norte, and Coors and La Orilla NW) and February 10, 2013 for the third intersection (the one located at Paseo Del Norte and Golf Course Road).[3] (*Id.* at 15:8–16:10, 18:10–15, 24:6–23.)

Sergeant Garcia asserts that he did not select the wrong date intentionally, and he did not know he had selected the wrong date until counsel for Plaintiffs deposed him on February 9, 2016. (*Id.* at 24:18–25:11.) Because the video only stays in the server system for 24 to 72 hours, it is not possible to retrieve the correct footage now. (*Id.* at 18:16–21.) It is not clear from the record who Sergeant Garcia gave the CDs to; he testified that he does not know when they were given to the investigators, or who else saw the footage other than Mr. Wilham. (*Id.* at 56:20–25, 62:14–63:21.) Sergeant Garcia stated that when evidentiary video is given to an officer, it is up to the officer to tag it into evidence. (*Id.* at 28:12–14.) RTCC policy does not allow its employees to store video. (*Id.* at 27:22–28:8.) He also stated that he does not have the ability to edit videos on RTCC computers. (*Id.* at 28:16–18.)

From the initial briefs and evidence submitted to the Court (*see* Docs. 179, 200), it was unclear if the CDs Deputy Gonzales burned at the RTCC and brought to Deputy Armijo contained

---

[3] Deputy Gonzales testified that he found footage from four intersections, but the parties concentrated on only three of the four intersections. (*See* Doc. 200, Ex. A at 87:18–25.)

footage from February 9 or February 10. Even after supplemental briefing and additional evidence submitted by the City, it is not entirely clear from the testimony submitted to the Court how footage from both February 9 and February 10, 2013 was retrieved and burned onto CDs. Both Deputy Armijo and Deputy Gonzales testified that they saw correct video footage from February 10, 2013. (Doc. 270, Exs. E–F.) They both remember seeing a "puff of smoke" in the lower left hand corner of the video feed from Paseo Del Norte and Eagle Ranch Road; what appeared to be Ms. Browder's Honda CR-V turn north on Golf from Coors onto Eagle Ranch Road; and what appeared to be Ms. Villanueva's Cadillac in the video feed from Coors Boulevard and La Orilla Road NW. (Doc. 200, Ex. A at 88:22–24; Doc. 270, Ex. E at ¶¶ 5–6, 10, Ex. F at ¶ 4.) But however the deputies managed to see footage from February 10, 2013, that footage has since disappeared.

      Deputy Armijo testified that he never had possession of the CDs, he simply watched them. (Doc. 270, Ex. F at ¶ 6.) Deputy Gonzales did have possession of the CDs, but he testified that he gave them to Sergeant Paul Watkins, and he does not know what happened to them after that. (*Id.*, Ex. E at ¶¶ 12–13.) The Custodian of Records for the BCSO said that the recordings obtained by Deputy Gonzales were uploaded to the Bernalillo County Traffic Unit share drive, and the original CDs were turned over to Assistant District Attorney Ray Montano. (Doc. 270, Ex. G at ¶¶ 1, 8.) Both the Custodian of Records and the Deputy District Attorney gave the City copies of the recordings in their possession (presumably those copies uploaded to the Bernalillo County Traffic Unit share drive and given to ADA Montano), but they appear to contain the same video footage (with date stamps from both February 9 and 10, 2013) already submitted to the Court. (*See* Docs. 179, Exs. 1–3; 270, Exs. H, K.) Therefore, the CDs with the correct footage from February 10,

2013 have vanished, and the footage with the February 9, 2013 date stamp were somehow saved instead.[4]

The City asserts that because the BCSO handled the initial investigation, no official from the City (including the APD) ever independently obtained copies of the footage. (Doc. 200 at 10.) The City asserts (without providing testimony to this effect) that the APD Internal Affairs investigators did not obtain footage from the RTCC directly, rather, they received copies of the footage from the BCSO. (*Id.*)

## II.     The Law on Spoliation

Putative litigants are under an "obligation to preserve evidence . . . when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (quoting *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d. Cir. 2001) (internal citation omitted); citing *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001) (internal citation omitted)); *see also U.S. ex rel. Baker v. Cmty. Health Sys., Inc.*, No. CIV. 05-279 WJ/ACT, 2012 WL 12294413, at *2 (D.N.M. Aug. 31, 2012). The Tenth Circuit specifies that this duty to preserve evidence arises at the time litigation is "imminent." *Baker*, 2012 WL 12294413, at *3 (citing *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (internal citation omitted)). "Spoliation includes the intentional or negligent destruction or loss of tangible and relevant evidence which impairs a party's ability to prove or defend a claim." *Baker*, 2012 WL 12294413, at *3 (quoting *U.S. ex rel. Koch v. Koch Indus., Inc.*, 197 F.R.D. 488, 490 (N.D. Okla. 1999)). To prevent spoliation, "the general rule is that '[o]nce a party reasonably anticipates litigation, it must

---

[4] The BCSO Custodian of Records was unable to produce any evidence tags, logs, or chain of custody forms that reflected the transfer to or from any person or agency. (*See* Doc. 270, Ex. G.)

suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents.'" *Baker*, 2012 WL 12294413, at *2 (quoting *Zubulake*, 220 F.R.D. at 218). The "litigation hold" applies to electronic data, such as the video footage here. *See., e.g.*, *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 620, 637 (D. Colo. 2007) (imposing sanctions for the destruction of electronic media).

"Sanctions for spoliation serve three distinct remedial purposes: punishment, accuracy, and compensation." *Baker*, 2012 WL 12294413, at *3 (quoting *Koch*, 197 F.R.D at 490). "Spoliation sanctions are proper when '(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence.'" *Turner*, 563 F.3d at 1149 (quoting *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007) (internal citation omitted)). "When deciding whether to sanction a party for the spoliation of evidence, courts have considered a variety of factors, two of which generally carry the most weight: (1) the degree of culpability of the party who lost or destroyed the evidence; and (2) the degree of actual prejudice to the other party." *Baker*, 2012 WL 12294413, at *3 (quoting *Patten v. Target Corp.*, No. 08-CV-01043-REB-KMT, 2009 WL 1279331, at *3 (D. Colo. May 6, 2009) (internal quotation omitted)).

"Federal courts possess inherent powers necessary 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc.*, No. 97-5089, 139 F.3d 912, 1998 WL 68879, at *3 (10th Cir. 1998) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (internal quotation omitted)). "Among those inherent powers is 'the ability to fashion an appropriate sanction.'" *Id.* (quoting *Chambers*, 501 U.S. at 44; subsequent citation omitted). Court-fashioned spoliation sanctions include, for example: an award of attorney fees; an order that the culpable party produce related documents

regardless of any claims of privilege or immunity, *Baker*, 2012 WL 12294413, at *18; excluding evidence or striking part of a party's proof; allowing the aggrieved party to question a witness in front of the jury about the missing evidence, *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1220 n.6 (10th Cir. 2008) (citation omitted); and imposing costs for creating a substitute for spoliated data, *Koch*, 197 F.R.D. at 490–91. Such sanctions may be imposed even where evidence was lost or destroyed due to negligence, so long as the party seeking sanctions can show it suffered prejudice and the other side was on notice that the evidence should be preserved. *See Baker*, 2012 WL 12294413, at *3. "Sanctions for spoliation may also be designed to promote accurate fact finding by the court or jury." *Koch Ind.*, 197 F.R.D. at 490. Finally, where "the aggrieved party seeks an adverse inference to remedy the spoliation, it must also prove bad faith." *Turner*, 563 F.3d at 1149. "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." *Id.* (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997) (internal citation omitted)).

### III. Discussion

#### A. Timeliness and adequacy of the litigation hold

"When litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Baker*, 2012 WL 12294413, at *4 (quoting *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) (internal citation omitted)). Plaintiffs argue that the City knew litigation was imminent both due to the circumstances of the accident and as evidenced by Chief Schultz's direction to preserve the video footage. (Doc. 179 at 5–6.) As the Court noted in its previous Memorandum Opinion and Order imposing sanctions for the City's loss of Defendant Casaus's cell phone, it is likely that litigation was "reasonably foreseeable" the

moment the City became aware that a police officer was involved in a fatal traffic accident. (Doc. 269 at 10 n.3.)

Complicating matters is the fact that the RTCC and the procedures for saving data were new and untested. This was the first time Sergeant Garcia pulled video from the traffic cameras, and he was learning as he went. The fact that the time stamp appeared to be an hour off, particularly since that hour was right around midnight and a date change, threw another wrench in the works. It bears underscoring, however, that while this accident served as a trial by fire for the new system, the City is not excused from having effective information management procedures in place. If anything, the Court would expect the City to have paid closer attention to detail for this initial attempt at video retrieval. Additionally, the City's argument that the BCSO investigators are at fault for the loss is a reproachable attempt to shift blame. Notwithstanding that BCSO had taken the lead in the immediate investigation, the City still had a duty to preserve evidence generated and retrieved by the City-controlled RTCC, as litigation was reasonably foreseeable. Yet despite the complications and what appears to be honest human error in losing the video footage, the City was still on notice that litigation was reasonably foreseeable. The Court can pardon human error or negligence, but not when they are symptoms of a larger problem: an inadequate information management and evidence retention policy.

B.     **Spoliation Sanctions**

"The two most important factors" the Court considers "in determining spoliation sanctions are (1) culpability of the offending party; and (2) actual prejudice to the other party." *Baker*, 2012 WL 12294413, at *12 (citation omitted).

1.      **Culpability**

"Culpability is the degree of fault to be assigned to the offending party." *Id.* "[T]he '[d]estruction of potentially relevant evidence obviously occurs along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality.'" *Mariposa Farms LLC v. Westfalia-Surge Inc., et al.*, 03cv00779 JEC/LAM, Doc. 193 at 5 (D.N.M. Feb. 3, 2005) (quoting *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009)). The evidence here shows that the video footage was lost due both to human error and to the fact that the City did not yet have an adequate process in place to verify that City employees had relevant evidence saved for litigation holds.

If this were the only time the City had lost relevant evidence, perhaps the Court would not find more than a negligible amount of culpability on the part of the City. But this is Plaintiffs' second motion for sanctions based on spoliation (Docs. 149, 179), and Plaintiffs have another motion to compel pending based on allegations of intentional spoliation of evidence (Doc. 250). The City's culpability—at least in the two motions for sanctions the Court has considered thus far—is not evidenced by intentional destruction of documents, but in its "questionable information management [and evidence retention] practices." *See Phillip M. Adams & Assocs., L.L.C. v. Dell, Inc.*, 621 F. Supp. 2d 1173, 1193 (D. Utah 2009). "A court—and more importantly, a litigant—is not required to simply accept whatever information management practices a party may have. A practice may be unreasonable, given responsibilities to third parties." *Id.*

The City is involved in litigation on a regular basis, and it is incumbent on the City to implement effective policies and procedures to safely secure relevant information and evidence. As demonstrated by the City's argument that the lost footage was due in part to the fact that the RTCC was new and the employees "were kind of learning as they went" (Doc. 200 ¶ 16), it is

apparent that the City's system "of questionable reliability . . . has evolved rather than been planned, [and it] operates to deny [Plaintiffs] access to evidence. This should not be excused." *Phillip M. Adams & Assocs., L.L.C.*, 621 F. Supp. 2d at 1193.

"An organization should have reasonable policies and procedures for managing its information and records." *Id.* at 1193–94 (quotation omitted). "'The absence of a coherent document retention policy' is a pertinent factor to consider when evaluating sanctions." *Id.* at 1194 (quoting *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 123 (S.D. Fla. 1987)). "Information management policies are not a dark or novel art[,]" and there are a number of quality policy guidelines the City can use as models to create a better program. *Id.* The City's current "practices invite the abuse of rights of others, because the practices tend toward loss of data." *Id.*

From no more than what the Court has seen in this one case, the City's practices place a wide variety of employees and non-employees "in the position of deciding what information is relevant[,]" (i.e., allowing the BCSO investigators to decide what evidence to preserve), as well as how to preserve evidence (i.e., giving the warehouse manager the ability to recycle Defendant Casaus's cell phone after receiving a clearance form from the APD payroll department). *See Phillip M. Adams & Assocs., L.L.C.*, 621 F. Supp. 2d at 1194. The City clearly failed to have an effective system in place to ensure that relevant and correct evidence was preserved (i.e., failing to check dates on video footage and failing to preserve Defendant Casaus's cell phone). (*See* Doc. 169 at 8, Ex. D at 28:15–30:23.) The City "alone bears responsibility for the absence of evidence it would be expected to possess." *Phillip M. Adams & Assocs., L.L.C.*, 621 F. Supp. 2d at 1194. While Plaintiffs have not shown the City intentionally destroyed evidence, "it is clear that [the City's] lack of a retention policy and irresponsible [evidence] retention practices are responsible for the loss of significant" evidence. *Id.*

### 2. Prejudice

The Court finds Plaintiffs have demonstrated some prejudice. First, Plaintiffs argue the lost footage would have helped establish "when the traffic light for Northbound Eagle Ranch turned green prior to Lindsay Browder's arrival at the intersection . . . ." (Doc. 179 at 3.) Plaintiffs anticipate that Defendants will attempt to make an issue of the timing of the traffic lights, as well as whether Ms. Browder drove through a green or a red light. (*See* Doc. 179 at 8.) Under questioning from Plaintiff's counsel, Defendant's hired expert, Mr. Davis, acknowledged that footage from the traffic camera at Eagle Ranch Road and Paseo Del Norte may have provided helpful information about when the traffic lights were triggered. (*See* Doc. 179, Ex. 6 at 181:10–184:14.) Defendant counters that Deputy Gonzales viewed footage from the correct date and "determined there was nothing relevant to the investigation, other than footage of Lindsay Browder's Honda CR-V turning north from Coors onto Eagle Ranch Road." (Doc. 200 at 7 (citing Doc. 200, Ex. A at 88:22–24, 89:5–9).) The Court is unpersuaded by Defendant's assertion. In gathering information for an internal investigation, Deputy Gonzales may not independently decide—nor did he even necessarily consider—what is or is not relevant to Plaintiffs' civil case.

The *Baker* court noted that "prejudice is shown when the destroyed evidence goes to a critical issue and the evidence at hand is conflicting." 2012 WL 12294413, at *14. It is true that the lost footage goes to an issue where current evidence is conflicting. Plaintiffs have failed to convince the Court, however, that the correct footage would have shed any light on when the traffic light turned. The fact remains that the camera at Eagle Ranch Road and Paseo Del Norte was pointing toward a gas station; it is impossible to see the intersection itself, any of the traffic lights, or all of the traffic that may have passed through the intersection. (*See* Doc. 179, Ex. 1.) The Court suspects that both experts would find a way to spin any footage to support their opinions on fault.

Plaintiffs have not shown more than a minimal amount of prejudice with respect to the loss of this footage.

Second, Plaintiffs assert that the correct footage from the intersection at Coors Boulevard and La Orilla Road NW would have "confirm[ed] with visual evidence the testimony of Jana Villanueva and the findings consistent therewith of [Deputy] Armijo" that the vehicle Defendant Casaus claimed to have been following could not have possibly been Ms. Villanueva's Cadillac. (Doc. 179 at 3.) The Court agrees that the footage Deputy Armijo relied on would have been helpful to the question of whether Defendant Casaus could have been following Ms. Villanueva's Cadillac. Plaintiffs are able to demonstrate real prejudice due to the loss of the video footage critical to an issue where there may be conflicting evidence (assuming Defendant Casaus intends to call Deputy Armijo's testimony into question).

### 3. Sanctions

Because the Court has found that the City "was under an obligation to preserve the" video footage, the City was negligent in losing the footage (even given the extenuating circumstances complicating retrieval of the footage), the Plaintiffs were prejudiced minimally by the loss of the footage from Eagle Ranch Road and Paseo Del Norte and more so by the loss of the footage from Coors Boulevard and La Orilla Road NW, the Court must determine appropriate sanctions, keeping in mind "the purposes to be served by exercising the court's power to sanction." *Cache La Poudre Feeds, LLC*, 244 F.R.D. at 621. Sanctions should punish, promote fact-finding accuracy, and compensate the aggrieved party. *See Baker*, 2012 WL 12294413, at *3 (citation omitted). Accordingly, the Court finds the following sanctions are appropriate:

(1) The Court will allow Plaintiffs to present evidence to the jury that video footage from the two intersections existed, that Chief Schultz knew the importance of preserving such

evidence, and that through negligence, the City lost the footage and along with it, any opportunity for the jury to learn what evidence might have been on it. Because the Court has found negligence, rather than bad faith, on the part of the City, it finds that a jury instruction requiring an adverse inference would be inappropriate. However, if either Defendant attempts to call Deputy Armijo's testimony about what he saw on the February 10, 2013 video footage into question, the Court will give an instruction that allows the jury to make any inference they believe appropriate in light of the spoliation. The Court leaves it to counsel to craft a jury instruction they can agree on. Failing agreement, the Court will craft its own such instruction; and

(2) The City will pay all reasonable expenses, including attorney fees, Plaintiffs incurred in bringing this motion.

**THEREFORE,**

**IT IS ORDERED** that Plaintiffs' Second Motion for Relief and Sanctions Based on Intentional Spoliation of Evidence by Defendant City of Albuquerque (Doc. 179) is **GRANTED IN PART**.

_____
**ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE**